EXHIBIT

**B**

| DISTRICT COURT, CITY & COUNTY OF DENVER, COLORADO<br><br>1437 Bannock Street<br>Denver, CO 80202 | |
|---|---|
| | DATE FILED: February 5, 2020 10:14 AM<br>FILING ID: BBE4A35E3C17D<br>CASE NUMBER: 2020CV30476<br><br>▲ COURT USE ONLY ▲ |
| Plaintiff:    Dr. William Moreau,<br>v.<br>Defendant:   United States Olympic & Paralympic Committee<br>_____<br>Attorneys for Plaintiff:<br><br>Name:      Darold W. Killmer, #16056<br>            Michael Fairhurst, #45987<br>Address:   1543 Champa Street, Suite 400<br>            Denver, CO 80202<br>Phone:     303-571-1000<br>Fax No.:   303-571-1001<br>E-mail:    dkillmer@KLN-Law.com<br>            mfairhurst@KLN-Law.com | Case No.:<br><br>Div.:          Ctrm.: |
| **COMPLAINT & JURY DEMAND** | |

Plaintiff, Dr. William Moreau, by and through his counsel, Darold W. Killmer and

Michael Fairhurst of the law firm of KILLMER, LANE & NEWMAN, LLP, submits his Complaint

and Jury Demand, and states as follows in support:

## I.    __INTRODUCTION__

1.      No number of gold medals are worth putting the health and safety of our
athletes at risk. When the very body that Congress created to care for our
athletes becomes more concerned about winning and protecting your brand
than the athletes themselves, it is time for a change.

U.S. Rep. Diana DeGette, D-Colo., Head of the Energy and Commerce Committee's Oversight

and Investigations panel. *DeGette, Gardner Back USOC Oversight Push in Congress*, The

Gazette, https://gazette.com/news/degette-gardner-back-usoc-oversight-push-in-congress/article_1cd122fe-914c-11e9-9b71-c30758906a78.html (June 17, 2019).

2.      That is how Rep. Diana DeGette described the USOC in June of 2019 as part of an ongoing bipartisan effort to reform the United States Olympic Committee (USOC) [1].

3.      Similarly, Plaintiff Dr. William ("Bill") Moreau repeatedly spoke out to top-level USOC management regarding the same and similar well-founded concerns, which are of paramount public importance.

4.      Dr. Moreau was the USOC's Vice President of Sports Medicine, until the USOC illegally fired him.

5.      During his employment with the USOC, Dr. Moreau led the way in seeking to reform the USOC by attempting to forward several initiatives to better protect athletes from sexual and other abuses perpetrated by predators like Larry Nassar.

6.      Dr. Moreau pressed for athletes to be appropriately evaluated and treated in compliance with all medical laws and regulations and the USOC's own ethics policy.

7.      Dr. Moreau advocated for the USOC to focus and create rapid change related to the athletes' mental and physical health.

8.      Dr. Moreau urged the USOC to appropriately address the sexual abuse and exploitation of young female athletes.

9.      Angry about Dr. Moreau's insistence that these problems be addressed, the USOC fired him in retaliation for it, in violation of public policy and Colorado law.

---

[1] The United States Olympic Committee changed its name to the United States Olympic & Paralympic Committee in 2019. For ease of reference, Plaintiff generally still refers to the organization as the USOC herein, as that is how the organization is best known and it was the name of Dr. Moreau's employer when he worked for the USOC.

## II.    <u>JURISDICTION & VENUE</u>

10.    Jurisdiction of this Court is invoked pursuant to COLO. REV. STAT. § 13-1-124(1)(a)-(c). This action is authorized and instituted pursuant to the common law of Colorado, based on the Defendant's wrongful discharge of Plaintiff in violation of public policy.[2]

11.    Venue is proper in this Court pursuant to COLO. R. CIV. P. 98(c)(5). At all relevant times, Defendant has done business in the City and County of Denver, Colorado.

## III.    <u>PARTIES</u>

12.    The Plaintiff, Dr. William Moreau, was working and engaged in the transaction of business within El Paso County, Colorado at all relevant times, until Defendant USOC fired him. Additionally, Dr. Moreau was at all relevant times a resident of and domiciled in El Paso County, Colorado.

13.    Defendant United States Olympic & Paralympic Committee's principal place of business is and at all times relevant to the complaint was in Colorado Springs, Colorado, which is located in El Paso County, Colorado. Defendant United States Olympic & Paralympic Committee also does and at all relevant times has done business in the City and County of Denver, Colorado.

14.    Defendant United States Olympic & Paralympic Committee is a federally chartered corporation that has exclusive jurisdiction over U.S. participation in three athletic competitions: the Olympic Games, the Paralympic Games, and the Pan American Games. 36 U.S.C. §§  220502, 220503(3)(A).

---

[2] Plaintiff anticipates that he will seek to amend his pleadings to add a claim for punitive damages pursuant to C.R.S. § 13-21-102, after disclosures have been exchanged and after he has established the existence of a triable issue of punitive damages.

15.     Under the Ted Stevens Olympic and Amateur Sports Act ("ASA") as amended, *id*. §§ 220501-220529, Congress has charged the USOC to "obtain for the United States the most competent amateur representation possible in each event of the Olympic Games, the Paralympic Games, and the Pan-American Games." *Id*. § 220503(4).

## IV.     FACTUAL ALLEGATIONS

### Dr. Moreau's impeccable credentials and performance at the USOC

16.     Dr. Moreau loyally and successfully worked for the USOC for ten years, until May 2019.

17.     He had an impeccable performance record in all the roles he held there, which ranged from chief medical officer for numerous international Olympic events to managing the sports medicine clinics at the USOC training centers in Colorado, California, and New York to (most recently) Vice President of the Sports Medicine Division.

18.     During every year that he worked for the USOC, Dr. Moreau ranked in the top quartile of its employees, receiving an overall performance score of 4 or 5 on a 5-point scale, as scored by five different USOC managers.

19.     This includes an overall rating of 5 ("distinguished performance") in the last review he ever received from the USOC, in December 2018, mere months before his firing.

20.     Even more recently, in February 2019, Dr. Moreau earned a merit-based based raise for his outstanding performance in the year 2018.

21.     Meanwhile, Dr. Moreau never received any formal disciplinary writeup or formal reprimand during his long tenure with the USOC.

22.     Dr. Moreau's impressive professional background goes far beyond his experience at the USOC. Dr. Moreau has presented over 400 educational lectures nationally and

internationally on numerous sports-medicine related topics. The medical leadership of the International Olympic Committee came to rely on Dr. Moreau for his expertise.

23.     He has authored or co-authored more than 60 published articles. Those articles address subjects ranging from patients' informed consent to scoliosis and sports participation to utilization of diagnostic imaging to sports-related concussions to routine screening for iron deficiency among athletes.

24.     Several of Dr. Moreau's publications have won awards.

25.     Further, Dr. Moreau is a clinical instructor at the University of Colorado, School of Medicine, and he founded the United States Coalition for the Prevention of Illness and Injury in sport in 2017 and the USOC Medical Standards Advisory Group in 2018.

**The USOC's sudden firing of Dr. Moreau**

26.     Despite his excellent performance and universal respect, the USOC notified Dr. Moreau on May 13, 2019 that it was firing him – effective immediately – during a meeting with USOC Chief of High Performance Rick Adams and Chief of Human Resources Bobbi McPherson.

27.     These USOC officials admitted to Dr. Moreau that USOC was **not** firing him for cause, and instead claimed that the organization merely wanted to replace him with a person who had a Doctor of Medicine (M.D.) degree rather than a Doctor of Chiropractic (D.C.) degree.

28.     The USOC's asserted reason for suddenly firing Dr. Moreau is pretextual and does not withstand scrutiny (and is demonstrably false), for many reasons.

**The USOC's demonstrably pretextual claimed reason for firing Dr. Moreau**

29.     For starters, the USOC replaced Dr. Moreau with Dustin Nabhan, D.C. as a Vice President within the Sports Medicine Division.

30.     This action directly refutes the USOC's sole claimed reason for firing Dr. Moreau – that it wanted to replace him with someone who has a Doctor of Medicine degree. Dr. Nabhan instead has a Doctor of Chiropractic degree, *just like Dr. Moreau*.

31.     Moreover, common sense dictates that the USOC would have asked Dr. Moreau to assist with his successor's transition into their new role, given how complex and demanding the job is[3], if the USOC truly had no other reason for its decision to fire Dr. Moreau.

32.     Likewise, common sense dictates that Dr. Moreau's background and credentials posed no problem to the USOC, as he ascended the ranks there for a decade and excelled as Vice President of the Sports Medicine Division.

33.     In his Vice President position, Dr. Moreau was much more of a business manager than a medical care provider, rendering USOC's assertion that medical credentials motivated the decision all the more dubious.

34.     What is evident is that the USOC wanted to ambush Dr. Moreau with news of his termination – and then to remove him from the organization with the utmost haste. The question that naturally arises is why.

35.     Dr. Moreau certainly did not engage in conduct that legitimately merited an immediate termination (or even discipline or counseling).

36.     Moreover, while the USOC has been under the gun publicly regarding its mishandling of sex abuse, including the widely publicized and appalling Dr. Larry Nasser scandal, Dr. Moreau was in no way implicated in those debacles.

---

[3] This included the management of multiple complex medical cases and other important and ongoing responsibilities at the time of his firing. The USOC without warning cut off Dr. Moreau's participation in them, putting patients and athletes at risk and destabilizing the organization more broadly.

37.     To the contrary, Dr. Moreau demonstrably sought to promote a culture at the USOC that prioritized athlete health and safety ahead of medals and money.

38.     Not long ago, the law firm Ropes & Gray conducted an independent investigation into the factors underlying Dr. Larry Nasser's sexual abuse of young women under his care at the USOC. Its full report was released on December 10, 2018.

39.     In the report, Ropes & Gray concluded that the "USOC as an organization was effectively disabled from considering and taking appropriate action in response to the athlete complaints about Nassar **due to the decision by two senior officers of the USOC to keep the matter to themselves**." p. 101 (bold added). Those officers were former Chief of Sport Performance Alan Ashley and former CEO Scott Blackmun.

40.     In sharp contrast, the report paints Dr. Moreau notably favorably, asserting, for example, that "Dr. Moreau spoke with Nassar at the Games about the practice of treating gymnasts outside of the central USOC medical area, telling Nassar that it would be 'safer for you' to treat the gymnasts next to other athletes and that Nassar 'shouldn't take care of athletes alone[.]'" p. 57.

41.     Dr. Moreau's courageous candor in the in-depth investigation of the tragic Nassar scandal was honest and consonant with public policy and the law demanding truthful reporting under the circumstances.  His contributions were material in uncovering the truths underlying that scandal.

42.     Thus, the answer to the question of why the USOC fired Dr. Moreau is this: the USOC terminated him in retaliation for his persistent advocacy in support of public policy that – contrary to the USOC's *modus operandi* – prioritized athletes' health and safety first and foremost.

## Dr. Moreau's extensive history of seeking to protect athletes' health and safety at the USOC

43.     Dr. Moreau has considerable expertise in the field of ethics, and he understands the importance of ethical conduct. He presents postgraduate education on ethics in healthcare and received an Iowa Supreme Court appointment to represent the public in attorney related ethics complaints.

44.     Dr. Moreau is a person who prizes honesty, integrity, and doing what is ethical and right, despite the personal risks that might entail.

45.     As the USOC knew before firing him, Dr. Moreau had frequently advocated for positive and necessary changes at the USOC – as was his right and duty to do. A non-exhaustive list of recent examples follows.

## Sexual abuse and exploitation of young female athletes who the USOC had a duty to protect

46.     In the spring of 2018 at the Drake Relays in Des Moines, IA, a USOC-employed Paralympic track coach called Dr. Moreau to report that a 15-year-old female Paralympic athlete was having suicidal ideation because a 20-year-old male Paralympic athlete had sexual relations with her during the Drake Relays.

47.     The USOC was responsible for serving as the 15-year-old girl's legal guardian at this event, as her parents were not with her in Iowa and she was under-age.

48.     The USOC was aware that minor female Paralympic athletes are one of the most common groups of highly vulnerable individuals victimized by sexual predators, but the USOC still placed the girl in a hotel room alone, which is where the sexual abuse occurred. Dr. Moreau informed USOC upper level management, including USOC Chief of High Performance Rick Adams, that the statutory rape had occurred.

49.     Yet, despite Adams commencing an internal "investigation" into the incident, the USOC did not even recognize a *crime* was committed until Dr. Moreau sent an email to the involved USOC executives, including Rick Adams, Nicole Deal, and Alan Ashley, explaining that the underlying sexual contact constituted statutory rape under Iowa law.

50.     Only then did the USOC report the incident to law enforcement.

51.     But the USOC still has not undertaken changes that are sufficient to protect minor athletes in situations like the one that happened in Iowa even though Dr. Moreau explained and provided solutions through subsequent oral and written communications.

52.     The USOC continues to place performance outcomes ahead of athlete safety.

53.     As another example, in around January 2019 (only a few months before Moreau's termination), a female athletic trainer witnessed a USOC-employed adult male strength and conditioning coach **naked in a public area sauna** located in sports medicine area at the USOC Colorado Springs training center.

54.     The Team USA under-18 women's gymnastics team was on campus for a training camp at the time in the same building.

55.     Obviously, an adult male who chooses to be naked in a public area close to and accessible to young girls is gravely inappropriate and poses a serious problem – particularly at the USOC, given its history and sexual abuse scandals.

56.     This issue was brought to Dr. Moreau's attention and, when it did, he immediately reported it along with his significant underlying concerns to the employee's USOC supervisor Kelly Skinner, who then reported the incident to USOC Human Resources.

57.     After that, the involved employee merely received an oral reprimand. In response, Dr. Moreau requested and had a meeting with USOC HR Representative Tim Henderson, during

which Dr. Moreau again expressed grave concern about the employee's inappropriate conduct along with the USOC's woefully insufficient remedial response.

58.     Dr. Moreau suggested that the involved employee be dismissed for his egregious lack of judgment.

59.     However, USOC's Human Resources Representative Henderson summarily rejected Dr. Moreau's stated concerns, preposterously contending that, because there was no sign posted in the public sauna area stating that people must wear clothes there, an oral reprimand was the only appropriate corrective action.  Such cavalier response to the incident is emblematic of USOC's tolerance of sexual misconduct and impropriety.

60.     The USOC employees who participated in the decision to fire Dr. Moreau, including but not necessarily limited to USOC Chief Executive Officer Sarah Hirshland, Chief of High Performance Rick Adams, Chief of Human Resources Bobbi McPherson, and General Counsel Christopher McCleary, were aware of Dr. Moreau's reported concerns and his suggested remedial action regarding the athletic trainer before firing him.

61.     Unfortunately, the USOC's deficient responses to the young girl's statutory rape in Iowa and the USOC employed strength coach who exposed himself in public were part and parcel with its standard operating procedure.

62.     The Ropes and Gray report depicts numerous institutional failures to appropriately report wrongdoings to proper law enforcement agencies.

63.     For instance, the report states that the "**USAG's and the USOC's inaction and concealment had consequences: dozens of girls and young women were abused during the year-long period between the summer of 2015 and September 2016**." p. 9 (bold added).

64.     The report further found that contributing factors to the Nassar debacle range from "**casual disregard to affirmative inaction, from cultural conditions to governance choices, from inadequate policies and procedures to the delayed response overall to the risk of sexual abuse in sport**…." p. 99 (bold added).

### USOC staff's dogged failure to create appropriate medical charts for patients, thereby putting patients in danger

65.     On September 11, 2018, during a meeting with USOC lawyers Chris McCleary and Evangeline Rivera, Dr. Moreau explained that USOC-employed sports psychologists and sports dieticians regularly were not following standards of care in maintaining medical charts – and that this must change in order to comply with state and federal regulations as well as known standards of healthcare.

66.     McCleary responded: "**Now you have blown the whistle and I must do something about it.**"

67.     Ultimately, what McCleary "did" in response to Dr. Moreau's blowing of the whistle was (in concert with others, including Adams) fire him for it.

68.     Dr. Moreau again described in detail his concerns surrounding USOC sports dieticians not following standards of care in a September 20, 2018 email to attorneys Chris McCleary and Evangeline Rivera.

69.     In that email, he noted that USOC sports dieticians demonstrate a **65% failure rate** to create a medical record note in conjunction with their interpretation of an individual athlete's laboratory studies.

70.     He asserted in the email that USOC sports dieticians should, at a minimum, create electronic health record chart entries in connection with their review and interpretation of laboratory tests in which they are involved.

11

71.     Dr. Moreau explained in the email that "[t]he risk is when a provider requests and interprets a medical test and subsequently provides healthcare guidance based upon this test it would necessitate an entry into the patient's medical record for the best interests of the patient, to meet known standards of care, and to decrease risk, regardless of the individuals licensing/credentialing."

72.     Dr. Moreau stated that the lack of sports dietitians' compliance may be because they are creating medical records outside the USOC electronic health record. If so, he stated that "[t]his leads to concerns centered on the protection of health information and the lack of following the best care pathway of providing one central healthcare record within a system of providers."

73.     Indeed, creating complete and accurate medical records for patients is a basic tenet of all aspects of medicine and federal and state laws and standards of care.

74.     Medical records are important for documenting medical providers' assessment and treatment of patients. They are essential for continuity of care between medical providers, for assessing patient's responses to medical interventions, and for tracking patients' health over time

75.     When medical providers review an incomplete medical record, their own ability to evaluate and properly treat a patient is compromised. This increases the chances of a negative outcome.  And, in the unfortunate event of a negative care outcome, the lack of a medical chart prevents a review of care and may impede the ability of a patient to take legal action.

76.     It is therefore imperative that psychologists, dieticians, and other healthcare providers who are engaged in clinical mental health care create and maintain medical records related to their care and protect the patient's Personal Health Information (PHI).  If a healthcare

provider, like a sports dietitian or psychologist, creates a record of a patient encounter solely on a personal record keeping system, such as a laptop or in a notebook (as was often the case at the USOC, despite Dr. Moreau's objections), this act does not meet federal HIPAA[4] laws or known standards of care. These types of records are not available to the patient, other members of the healthcare team, or subsequent providers should the employee leave the company.

### The USOC's persistent failure to adequately treat athletes' severe mental health conditions

77.     Dr. Moreau became aware that an Olympic athlete had attempted suicide in February of 2019. Dr. Moreau understood that the involved individual had disengaged from follow up psychiatric care where they resided. Although he was not involved in the athlete's care, Moreau learned that the USOC was forming a committee of USOC employed individuals to meet and talk about how the USOC might help this suicidal individual.

78.     Dr. Moreau correctly determined that an individual who attempts suicide and disengages from follow-up care requires an emergent medical intervention from a psychiatrist who is best trained to manage this type of patient.

79.     Dr. Moreau explained to USOC Chief of High Performance Rick Adams that patients with a heart attack go to the emergency room so a cardiologist can best determine how to save their life. He stated that likewise a suicidal individual needs the same level of attention,

---

[4] The Health Insurance Portability and Accountability Act, commonly referred to as HIPAA, was established in 1996 to set national standards for the confidentiality, security, and transmissibility of personal health information. Healthcare providers are required, under the HIPAA Privacy Rule, to protect and keep confidential any Personal Health Information. It also sets limits and conditions on its use and disclosure without patient authorization. The Rule also gives patient's rights to their PHI, including rights to obtain a copy of their medical records, and request corrections. The Department of Health and Human Services defines covered entities as healthcare providers, health plans, and healthcare clearinghouses, which include hospitals, physicians, chiropractors, dentists, optometrists, and **nonprofit organizations like the USOC that provide some healthcare services**.

but from a psychiatrist, and that the USOC concept of managing a mental health medical emergency "by committee" was woefully deficient and in fact a dangerous pathway to follow.

80.     Yet, Adams continued to support the committee approach to managing this mental health emergency. Dr. Moreau became increasingly outspoken as he pressed to make the USOC engage in an appropriate, immediate, and meaningful way to help this athlete during their mental health crisis.

81.     On March 7, 2019, Dr. Moreau again pleaded with Mr. Adams to respond and engage to get the athlete proper care. Dr. Moreau stated to Mr. Adams that "**the USOC is not following standards of care related to the management of suicidal athletes. We do not have the appropriate internal resources to manage these serious issues in house. If we do not make changes quickly, in the next day, next week, next month or next year an athlete we are responsible for will again take their own life**." Mr. Adams was aware of but failed to respond to Moreau's plea for urgent action.

82.     The next day, March 8, 2019, the athlete committed suicide.

83.     On March 19, 2019, Dr. Moreau yet again attempted to engage USOC leadership to learn from the tragic outcome of this USOC system failure. He sent an email to Rick Adams and Chris McCleary explaining in detail why he continued to object to the USOC's plan to "internalize" the management of athlete mental health issues ("MH") in the wake the athlete's suicide.

84.     Dr. Moreau stated in the email that MH management of suicidal ideation using a committee approach is a dangerous pathway to follow.

85.     Dr. Moreau supported his written criticism of the USOC's approach to mental health issues with citations to numerous evidence-based studies.

86.     He stated that it was disturbing to hear, during the meeting to develop USOC mental health care planning, lead USOC clinical sports psychologist Karen Cogan dismissively say, "People who want to kill themselves, will kill themselves."

87.     And Dr. Moreau identified that his Sports Medicine Division would not attempt to internally treat severe mental health issues as recommended by the committee and he urged the USOC to do as follows:

> USOC Sports Medicine will directly manage severe MH illnesses by immediately referring to a center or related professional who can manage the specific MH disorder. We will not manage serious MH disorders any different than any other serious illness we encounter. We will promptly refer to the appropriate specialist.

### The USOC's failure to follow numerous additional state and federal laws designed to protect patient health and safety

88.     On January 16, 2019, Dr. Moreau asserted during a meeting with Rick Adams that the USOC was not complying with federal and state laws for mandatory reporters and that USOC sports science staff was not following state-created standards of care regarding the creation and protection of athlete's protected health information.

89.     Dr. Moreau had previously raised these concerns during a September 2018 meeting with USOC legal counsel Chris McCleary and Evangeline Rivera. But, as usual, the USOC failed to address the issue.

90.     Dr. Moreau told Mr. Adams during the January meeting that the USOC needed to come into compliance with these laws.

91.     Specifically, Dr. Moreau stated to Mr. Adams that USOC sports performance staff routinely are improperly accessing patients' medical files in violation of patients' privacy rights. Dr. Moreau explained that, because the athletes generally know that USOC officials were monitoring and surveilling their medical files, they were in some circumstances choosing not to

seek needed medical care out of fear that their private and potentially embarrassing medical information would become widely known among USOC staff.

92.     Dr. Moreau also repeatedly discussed with USOC management the organization's failure to ensure that its dieticians and psychologists complied with the law and other public policies.

93.     Further explanation of the applicable laws and regulations – and how the USOC violated them – is in the section that follows. Dr. Moreau clearly raised the issues set forth below with the USOC – including those who participated in the USOC's decision to fire him – before the USOC fired him.

**Sources of public policy underlying Dr. Moreau's opposition to the USOC's misconduct**

94.     Dr. Moreau performed important public obligations at the USOC designed to protect patient health and safety.

95.     In so doing, he repeatedly engaged in conduct protected under at least the Colorado common law, and the USOC could not lawfully fire him for such conduct.

96.     Several specific sources of public policy underlying Dr. Moreau's opposition to the USOC's pattern of mismanagement and malfeasance follow.

**Statutory rape of 15-year-old Paralympic female athlete who the USOC was legally required to protect**

97.     The USOC had the legal and ethical duty to serve as a guardian to a child[5] who was subjected to sexual abuse in the State of Iowa during an athletic competition.

---

[5] A child is defined as any person under the age of 18 years under Iowa Code § 232.68.

98.     As Dr. Moreau asserted to Rick Adams and other USOC executives, the USOC nonetheless failed to follow state[6] and federal[7] laws, and its own publicly displayed policy,[8] by failing to promptly report the sexual abuse of the minor to law enforcement and others.

99.     Indeed, all 50 states, the District of Columbia, and the U.S. Territories have child abuse and neglect reporting laws mandating that certain professionals and institutions expeditiously refer suspected maltreatment to a child protective services (CPS) agency.[9]

100.     The USOC first became aware of the young girl's statutory rape on April 26, 2018.

101.     Yet, four days passed before the USOC reported it to *any* external body (which only happened at Dr. Moreau's behest) by filing a SafeSport complaint on April 30 and then reporting it to the West Des Moines Police Department on May 1.

102.     The USOC was obliged under Iowa law[10] to report the child abuse to the state DHS within 24 hours of learning of the event.

---

[6] Pursuant to Iowa Code §§ 232.69 & 232.70, a mandatory reporter of child abuse who reasonably believes that a child has been abused must report it to the Department of Human Services **within 24 hours of becoming aware of the situation**. At minimum, health practitioners employed by the USOC are mandatory reporters under Iowa Code § 232.69.

[7] 115 P.L. 126, 132 Stat. 318, 2018 Enacted S. 534, 115 Enacted S. 534 - Protecting Young Victims from Sexual Abuse and Safe Sport Authorization Act of 2017 (a key purpose of that law is "[t]o prevent the sexual abuse of minors and amateur athletes by requiring the prompt reporting of sexual abuse to law enforcement authorities[.]").

[8] United States Olympic & Paralympic Committee. (n.d.). Athlete Safety. Retrieved August 22, 2019, from https://www.teamusa.org/Team-USA-Athlete-Services/Safe-Sport.

[9] *See* "Child Abuse A Guide for Mandatory Reporters." Comm. 164. Iowa Department of Human Services. July 2019, at p. 5. Available at: https://dhs.iowa.gov/sites/default/files/Comm164.pdf?090920191944.

[10] Iowa Code §§ 232.69 & 232.70.

103.   Likewise, federal law required "covered individuals"[11] who learn of the facts to report the suspected abuse to the appropriate agency "as soon as possible"[12].

104.   And the USOC's own athlete safety policy[13] states: "**All cases of suspected emotional, physical or sexual abuse of a minor (under the age of 18) must be reported to law enforcement (or in some states child protective services) immediately.** The appropriate agency is most often the local law enforcement office where the incident occurred." (emphasis added).

105.   But the USOC clearly failed to follow its own policies and other binding legal responsibilities here – and Dr. Moreau assiduously and appropriately blew the whistle in response.

106.   The problems did not stop with the USOC's late reporting of the statutory rape, in violation of public policy.

107.   On May 1, 2018, Dr. Moreau was copied on an email communication that included the USOC's SafeSport claim.

---

[11] The USOC clearly was a "covered individual" under the Protecting Young Victims from Sexual Abuse and Safe Sport Authorization Act of 2017. As stated in Sec. 101: ''(9) the term 'covered individual' means an adult who is authorized, by a national governing body, a member of a national governing body, or an amateur sports organization that participates in interstate or international amateur athletic competition, to interact with a minor or amateur athlete at an amateur sports organization facility or at any event sanctioned by a national governing body, a member of a national governing body, or such an amateur sports organization".

[12] *See* Sec. 101 of the Protecting Young Victims from Sexual Abuse and Safe Sport Authorization Act of 2017 ("(2) COVERED INDIVIDUALS.—A covered individual who learns of facts that give reason to suspect that a child has suffered an incident of child abuse, including sexual abuse, shall as soon as possible make a report of the suspected abuse to the agency designated by the Attorney General under subsection (d).").

[13] *See* United States Olympic & Paralympic Committee. (n.d.). Athlete Safety. Retrieved August 22, 2019. Available at: https://www.teamusa.org/Team-USA-Athlete-Services/Safe-Sport.

108.    He was alarmed to see that the USOC had absurdly contended in the claim that the case did not involve possible child abuse and/or neglect.

109.    Simply by using an internet search engine, Dr. Moreau easily confirmed that a 15-year-old cannot legally give consent to sexual activity with person that is four or more years older[14], and that the USOC had incorrectly indicated otherwise that a crime was not committed in the claim.

110.    He immediately shared this information with USOC Chiefs Rick Adams, Chris McCleary and Alan Ashley in an email dated May 1, 2018.

111.    Dr. Moreau thereby sought to put an end to the USOC's violations of public policy, again.

### Defendant USOC's failure to follow numerous established medical standards of care

112.    As detailed above, Dr. Moreau also repeatedly objected to the USOC's failure to follow medical standards of care during but by no means limited to a September 2018 meeting with Chris McCleary and Evangeline Rivera, and a January 16, 2019 meeting with Rick Adams.

113.    A non-exhaustive description of the public policies from which these standards of care emanate follows.

114.    The USOC is a member organization of the International Olympic Committee.[15] The IOC's Olympic Movement Medical Code specifically addresses medical records and athletes' rights regarding their healthcare.[16]

---

[14] Iowa Code §§ 702.17, 709.4, 902.9.

[15]  The IOC Members. Available at: https://www.olympic.org/ioc-members-list.

[16] (2016) Olympic Movement Medical Code. Available at: https://stillmed.olympic.org/media/Document%20Library/OlympicOrg/IOC/Who-We-Are/Commissions/Medical-and-Scientific-Commission/Olympic-Movement-Medical-Code-31-03-2016.pdf.

115.    As Dr. Moreau explained to Mr. Adams, Ms. Rivera, Mr. McCleary, and other high-ranking USOC executives, the USOC failed to follow the Medical Code of the IOC. More specifically, the USOC violated at least the IOC's Olympic Movement Medical Code policies that follow:

- "Athletes enjoy the same fundamental rights as all patients in their relationships with physicians and health care providers, in particular, respect for:[17]

  a. their human dignity;

  b. their physical and psychological well-being;

  c. the protection of their health and safety;

  d. their self-determination; and

  e. *their rights to privacy and confidentiality.*"

  (emphasis added)

- "The relationship between athletes, their personal physician, team physician and other health care providers must be protected and subject to mutual respect. The health and the welfare of athletes are pre-eminent and prevail over competitive, economic, legal or political considerations."[18]

- "All information about an athlete's health status, diagnosis, prognosis, treatment, rehabilitation measures and all other personal information must be kept confidential. The applicable legislation concerning the confidentiality and security of personal health information must be respected."[19]

- "Confidential information regarding the health of athletes can be disclosed only if they give explicit consent thereto, or if the law expressly provides for this. When athletes are informed that, to the extent necessary for their care, information is disclosed to other health care providers, their consent may be presumed. Athletes may withdraw their consent for the sharing of relevant medical information with other health care providers involved in their care at any time. The implications of withholding relevant medical information from other health care providers involved in their care must be carefully explained to them."[20]

---

[17]  (2016) Olympic Movement Medical Code. 1.11
[18] (2016) Olympic Movement Medical Code. 1.12
[19] (2016) Olympic Movement Medical Code. 1.4.1
[20] (2016) Olympic Movement Medical Code. 1.4.2

- "All identifiable medical data on athletes must be protected."[21]

- "Intrusion into the private life of an athlete is permissible only with the consent of the athlete and if necessary for diagnosis, treatment and care, or otherwise permitted by law or under the provisions of the World Anti-Doping Code."[22]

- "Health care providers must disclose when they are acting on behalf of third parties (e.g., club, federation, competition organiser, National Olympic Committee (NOC), etc.). They must personally explain to the athletes the reasons for any examination and the significance of its outcome, as well as the nature of the information that will be provided to third parties."[23]

- "Athletes must be informed to whom the results of the medical test will be communicated and the potential consequences of any findings for participation (if any). Informed consent must be obtained from the athletes, which can be withdrawn at any time."[24]

116.    That is not all.

117.    Dr. Moreau also asserted to Rick Adams that Adams's direct reports were inappropriately accessing and "pursuing" patient files.

118.    Mr. Adams stated to Dr. Moreau he did not believe that was true.

119.    Dr. Moreau provided an audit to Mr. Adams of USOC electronic medical records that demonstrated well over 300 intrusions into athlete patient files by USOC-employed non-healthcare providers that report to Mr. Adams in clear violation of federal[25] and state[26]  laws.

---

[21] (2016) Olympic Movement Medical Code. 1.4.3
[22] (2016) Olympic Movement Medical Code.1.4.6
[23] (2016) Olympic Movement Medical Code. 1.6.6
[24] (2016) Olympic Movement Medical Code. 2.2.3
[25] The Health Insurance Portability and Accountability Act of 1996. Pub. L. 104-191. Stat. 1936. Web. 28 Aug. 2019.
[26] Colorado House Bill HOUSE BILL 18-1128. CONCERNING STRENGTHENING PROTECTIONS FOR CONSUMER DATA PRIVACY, effective as of September 1, 2018. *See* https://www.huntonprivacyblog.com/2018/06/14/colorado-amends-data-breach-notification-law-enacts-data-security-requirements/; *see also* https://www.huntonprivacyblog.com/wp-content/uploads/sites/28/2018/06/Colorado_18-1128.pdf.

120.     Dr. Moreau had an authorized USOC Sports Medicine staff member print the audit, which Dr. Moreau placed on Mr. Adams's desk.

121.     However, Mr. Adams failed to reply or ever engage Dr. Moreau regarding these many violations of athletes' medical records by his staff despite being aware of the contents of the audit Dr. Moreau gave him.

122.     Yet another problem Dr. Moreau repeatedly discussed with USOC management was the organization's failure to ensure that its dieticians complied with the law and other public policies.

123.     The individuals who participated in the decision to fire Dr. Moreau were aware that he had raised these concerns with the USOC before deciding to fire him.

124.     For instance, Dr. Moreau told USOC leadership that USOC California registered dieticians failed to adhere to California law, rules, regulations and best practices.

125.     Dr. Moreau also stated that USOC dietitians were routinely practicing outside their scope of practice and failed to meet standards of care regarding HIPAA, maintaining Protected Health Information (PHI), and maintaining appropriate records of the patient-athletes they treated.  Dr. Moreau objected to these practices on several occasions.

126.     As Dr. Moreau noted to the USOC, California registered dietitian may perform nutrition therapy only upon referral by a health care provider authorized to prescribe dietary treatments.[27]

127.     But USOC-employed California dietitians routinely failed to properly obtain a referral from a diagnostician when they engaged an athlete for nutritional consultation.

---

[27] Cal. Bus. & Prof. Code § 2586.

128.     This not only violated the law, the dietitian's failure to obtain a consult and subsequently create a medical record also placed the athletes' health at risk.

129.     Moreover, a registered dietitian may order medical laboratory tests related to nutritional therapeutic treatments when authorized to do so by a written protocol prepared and approved by the referring physician.[28]

130.     As Dr. Moreau explained to the USOC, USOC had no written protocol that adheres to this standard.

131.     While the dietitian may report the results of positive laboratory tests, the dietitian must limit the report to simple observable facts and not interpret the results or diagnose the patient.[29]

132.     USOC dietitians, however, routinely reviewed laboratory studies and provide their interpretations of the studies to the athletes. Dr. Moreau objected to that too.

133.     Additionally, Dr. Moreau clearly and repeatedly notified USOC leadership (including the people who participated in the decision to fire him) regarding the USOC's failure to meet federal and state laws, rules and regulations, as well as accepted standards of care, related to USOC-employed sports psychology staff who provided services to patient-athletes as required by the USOC's Ethics Policy[30].

134.     For example, Dr. Moreau stated that the USOC acted illegally and against public policy by *requiring* athletes to expose their PHI to USOC employees in order to access medical

---

[28] Cal. Bus. & Prof. Code 2586(c).
[29] 28 Op. Atty. Gen. 244.
[30] USOC. USOC Code of Conduct. Effective September 23, 2016. Available at: https://www.teamusa.org/-/media/Legal/USOC-Code-of-Conduct.pdf?la=en&hash=B4FBCEE5C4CEEAFE2FEECC80476B921F04161C6E. August 20, 2019.

care at the USOC operated clinics.[31] Such waivers of provisions are unlawful,[32] and put patients' health, safety and privacy at risk.

135.    Finally, Dr. Moreau told USOC leadership that the USOC failed to meet the demands of public policy regarding USOC psychologists maintaining and protecting the personal health information for the individuals who they see with a mental health concern.[33] At least one athlete stated that she did not feel safe at a USOC Olympic Training Center.

136.    The foregoing is not an exhaustive list of the sources of public policy underlying Dr. Moreau's communications with USOC management that ultimately led to his firing.

137.    Nonetheless, even this sampling accentuates the point that Dr. Moreau engaged conduct at the USOC that was protected against retaliation under the Colorado common law.

**Additional independent sources confirm that the USOC has a long history of covering up its wrongdoing and retaliating against people who seek to hold the organization accountable.**

138.    The USOC's continued failings have been the subject of Congressional investigations and, now, according to press reports, have caught the attention of the United States Department of Justice ("DOJ").

139.    The DOJ is investigating the U.S. Olympic and Paralympic Committee, USA Gymnastics, USA Swimming, and USA Taekwondo for their mishandling of allegations of

---

[31] Auth for Release of Med Info 022619 (redline).

[32] Under CAL. CIV. CODE § 56.37:
> (a) No provider of health care…may require a patient, as a condition of receiving health care services, to sign an authorization, release, consent, or waiver that would permit the disclosure of medical information that otherwise may not be disclosed….
> (b) Any waiver by a patient…shall be deemed contrary to public policy and shall be unenforceable.

[33] *See, e.g.*, COLORADO STATE BOARD OF PSYCHOLOGIST EXAMINERS. RULE 16 - RECORDS REQUIRED TO BE KEPT AND RECORD RETENTION (C.R.S. §§ 12-43-203(3), 12-43-222(1)(u)); CAL. BUS. & PROF. CODE § 2960(h); CAL. BUS. & PROF. CODE § 2960(j); CAL. BUS. & PROF. CODE § 2960(k); CAL. BUS. & PROF. CODE § 2960(r).

sexual abuse and for possible financial wrongdoing, according to several news outlets with knowledge of the investigations.

140.    These same sources and others state that these federal inquiries appear to be examining "failures in the Olympic system, writ large, to respond to signs of widespread child abuse."[34]

141.    Additionally, the attorneys general in California and Indiana have opened investigations into Olympic sports organizations that do business in those states, according to documents reviewed by The Washington Post and people with knowledge of the probes.

142.    Further, the USOC has a demonstrable history of retaliating against whistle blowers, whether they be USOC employees or former employees, athletes, or others.

143.    Not long ago, Olympic and Paralympic athletes formed a group called The Committee to Restore Integrity to the USOC.

144.    These Olympic and Paralympic athletes issued recommendations to "create an athlete first culture at the U.S. Olympic Movement" on January 21, 2019.

145.    One of their key recommendations was that "athletes must be afforded better whistleblower and retaliation protections." The Committee to Restore Integrity further explained:

**The threat of retaliation is so strong that over 25 athletes have told us that they cannot publicly sign on to Team Integrity's petition, not because they are not**

---

[34] Will Hobson, *Olympic Organizations Face Multiple Investigations by Justice Department, State Attorneys General*, WASH. POST (Sept. 13 2019), https://www.washingtonpost.com/sports/olympics/olympic-organizations-face-multiple-investigations-by-justice-department-state-attorneys-general/2019/09/13/7e190fa2-d654-11e9-9343-40db57cf6abd_story.html?noredirect=on; Rebecca Davis O'Brien, *DOJ Investigating Sex Abuse Within Olympic Organizations*, THE WALL STREET JOURNAL (Sept. 13 2019), https://www.wsj.com/articles/doj-investigating-sex-abuse-within-olympic-organizations-11568384974?mod=djemalertNEWS; Nancy Armour, *Report: DOJ Investigating FBI, Olympic Organizations' Handling of Sex Abuse Complaints*, USA TODAY (Sept. 13 2019), ( https://www.usatoday.com/story/sports/2019/09/13/fbi-olympic-organizations-handling-sex-abuse-complaints-probed/2311584001/.

**fully in accord with our goals and strategies, but because of the backlash and retaliation that they've witnessed or experienced by the USOC and NGBs.** A parent told us that when they participated in a formal complaint, they jeopardized their child's opportunity to participate in the Olympic Games. Some sports exploit subjective criteria for Team Selection procedures, making the athletes obedient and compliant, or else risk not making the Olympic Team.

146.     Moreover, the USOC has a longstanding, seemingly recalcitrant practice of prioritizing medals over athlete health and safety – again, the very problem that Dr. Moreau kept urging the USOC to address and resolve, ultimately to his great detriment.

147.     A Senate investigation report released on July 30, 2019 accentuates this point. The report found that,

> [r]epeatedly, institutions failed to act aggressively to report wrongdoing to proper law enforcement agencies. Repeatedly, men and women entrusted with positions of power prioritized their own reputation or the reputation of an NGB over the health and safety of the athletes. Repeatedly, USOC, [USA Gymnastics] and other [National Governing Bodies (NGBs)] took actions to conceal their negligence and failed to enact serious reforms, even after they were faced with the courageous accounts of survivors.

p. 2.

148.     On July 30, 2019, Senators Jerry Moran (R-Kan.) and Richard Blumenthal (D-Conn.) introduced sweeping bipartisan legislation (the *Empowering Olympic and Amateur Athletes Act of 2019*) to reform the U.S. Olympic and Paralympic Committee in response to findings of systemic abuse within the U.S. Olympic movement.

149.     This legislation seeks to address many of the issues that Dr. Moreau was highlighting before he was terminated by USOC.

150.     Finally, since 1982, more than 290 coaches and officials associated with the USOC sports organizations have been publicly accused of sexual misconduct, according to a *Washington Post* review of sport governing body banned lists, news clips, and court records in several states.

151.    The figure spans participants in 15 sports and amounts to an average of eight

adults connected to an Olympic organization accused of sexual misconduct every year — or

about an act of sexual abuse once every six weeks — for more than 36 years.[35]

152.    And for every one of these perpetrator coaches, there are an untold number of

victims left to suffer in the shadows.[36]

153.    Thus, the central issues underlying Dr. Moreau's case against the USOC are of

immense public interest and importance, and his whistleblower claims against the USOC are

supported by an extensive body of evidence.

## STATEMENT OF CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
**Wrongful Discharge in Violation of Public Policy**
(Against Defendant United States Olympic & Paralympic Committee)

154.    Plaintiff realleges and incorporates by reference the allegations set forth in this

Complaint as if fully set forth herein.

155.    During the course of his employment, Dr. Moreau exercised a statutory,

regulatory, rule-based and/or professional responsibility-based right relating to public health,

safety, or welfare, or performed a public duty relating to his basic responsibilities as a citizen, or

---

[35] Will Hobson & Steven Rich, *Every Six Weeks for More than 36 Years: When Will Sex Abuse in Olympic Sports End?*, WASH. POST (Nov. 17, 2017), https://www.washingtonpost.com/sports/every-six-weeks-for-more-than-36-years-when-will-sex-abuse-in-olympic-sports-end/2017/11/17/286ae804-c88d-11e7-8321-481fd63f174d_story.html?utm_term=.24ca96bb8af3.

[36] USA Gymnastics team doctor Larry Nassar's known victims alone now total at least 265. *See* Leonard Greene & Jessica Schladebeck, *Judge Says 265 Have Come Forward with Sexual Assault Allegations Against Larry Nasser*, N.Y. DAILY NEWS (Jan. 31, 2018), http://www.nydailynews.com/news/national/judge-265-larry-nassar-victims-article-1.3790363.

exercised an important job-related right or privilege because he reasonably believed he had a right to do so, as described more fully herein.

156.     Dr. Moreau reasonably and in good faith believed that the actions of the United States Olympic & Paralympic Committee violated statutory or regulatory law or legally enforceable professional standards of conduct and clearly expressed public policies, including but not to those set forth above.

157.     Defendant United States Olympic & Paralympic Committee was aware or reasonably should have been aware that Dr. Moreau's actions were based upon his reasonable belief that the conduct he opposed was in derogation of the clearly expressed public policy and that his conduct was in conformity with this public policy.

158.     Defendant terminated Dr. Moreau wholly or in part because of his objections to and/or refusal to participate in Defendant United States Olympic & Paralympic Committee's acts, which were in derogation of the above statutes, regulations, rules and clearly expressed public policy, and because he engaged in conduct that was consistent with and encouraged by this and other public policy.

159.     Defendant United States Olympic & Paralympic Committee's conduct was willful and wanton and attended by circumstances of malice and reckless disregard for the rights of Dr. Moreau.

160.     As a direct and proximate result of Defendant's actions, Dr. Moreau has suffered significant injuries, damages, and losses.

**SECOND CLAIM FOR RELIEF**
**Extreme and Outrageous Conduct**
(Against Defendant United States Olympic & Paralympic Committee)

159.    Plaintiff hereby incorporates all allegations contained in this Complaint as though fully set forth herein.

160.    By firing Dr. Moreau for objecting to the USOC's and its agents' mishandling of matters of profound public importance and by seeking to cover up, tolerate, and condone the USOC's and its agents' woefully insufficient remedial response to these issues, Defendant USOC engaged in conduct that is so outrageous in character and so extreme in degree that a reasonable member of the community would regard the conduct as atrocious, going beyond all possible bounds of decency, and utterly intolerable in a civilized community.

161.    The issues that the USOC outrageously tolerated, condoned, and sought to conceal from the public eye (by, among other things, firing Dr. Moreau) include but are not limited to widespread sexual abuse and exploitation of the young female athletes who the USOC had a duty to protect; the USOC's knowing and continued failure to create appropriate medical charts for patients, thereby putting patients in danger; the USOC's persistent failure to adequately treat athletes' severe mental health conditions, resulting in an USOC athlete committing suicide; and the USOC's violations of numerous additional state and federal laws designed to protect patient health and safety.

162.    Defendant USOC and its agents engaged in such conduct maliciously and with the intent of causing Dr. Moreau severe emotional distress.

163.    Defendant USOC's and its agents' conduct caused Dr. Moreau to suffer severe financial and emotional distress, and other injuries, damages and losses.

164.    Defendant USOC is liable for the conduct of its agents, including all the people who participated in the decision to fire Dr. Moreau and all the people who otherwise condoned,

tolerated, and sought to cover up the serious problems at the USOC that Dr. Moreau endeavored to remedy.

**WHEREFORE**, Plaintiff Moreau respectfully requests that this Court enter judgment in his favor and against Defendant, United States Olympic & Paralympic Committee, and award him all relief as allowed by law or equity, including but not limited to, the following:

a.      Appropriate equitable relief including declaratory and injunctive remedies, and front pay;

b.      Actual economic damages as established at trial;

c.      Compensatory damages, including, but not limited to, those for future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses;

d.      Punitive/exemplary damages[37] on all claims allowed by law and in an amount to be determined at trial;

e.      Pre-judgment and post-judgment interest at the highest lawful rate;

f.      Attorney's fees and costs, as allowed by law; and

g.      Such other and further relief allowed by law or equity or as justice requires.

**PLAINTIFF DEMANDS A JURY TRIAL ON ALL ISSUES SO TRIABLE.**

Respectfully submitted this 5th day of February 2020.

KILLMER, LANE & NEWMAN, LLP

*s/ Darold W. Killmer*

_____

Darold W. Killmer

---

[37] Given the circumstances of malice and willful and wanton conduct surrounding Defendant's and its agents' treatment of Dr. Moreau, Plaintiff anticipates seeking leave to amend the Complaint to seek punitive damages for Defendant's tortious conduct once Plaintiff has established *prima facie* proof of a triable issue of punitive damages in due course.

Michael Fairhurst
1543 Champa Street, Suite 400
Denver, CO 80202
(303) 571-1000
(303) 571-1001 fax
dkillmer@kln-law.com
mfairhurst@kln-law.com

ATTORNEYS FOR PLAINTIFF